TAVERNA IMPORTS, INC.,

      Plaintiff,

v.

A & M WINE & SPIRITS, INC.,
et al.,

      Defendants.

_____/

## ORDER ON DEFENDANTS' MOTIONS FOR SANCTIONS AND FEES

Defendants A & M Wine and Spirits, Inc., Cantina Wine and Spirits LLC, and Mario Taverna ("Defendants") filed a sanctions motion and a motion for attorney's fees against Plaintiff's counsel (David S. Harris, Esq.); his law firm (Law Office of David S. Harris); and Marisela Fonseca, the principal of Plaintiff (Taverna Imports, Inc.), who Defendants say spearheaded the litigation they condemn as unwarranted, unjustified, unreasonable, and motivated by bad faith. [ECF Nos. 94; 111].

These motions are the latest legal missiles fired in a multi-year-litigation war that has generated trials and appeals in state circuit court and the instant federal court litigation, including several multi-hour hearings and the submission of hundreds of pages of exhibits. In January 2017, Plaintiff filed a voluntary dismissal without prejudice of this lawsuit after the Third District Court of Appeal issued an opinion in a related

state court litigation involving three state court cases. In that opinion, the appellate court explained that a now-deceased person, Jule Laudisio, was not a Taverna director. Nevertheless, the litigation here has continued with unabated vigor, as Defendants seek imposition of sanctions and to obtain attorney's fees and costs. [ECF Nos. 89; 94; 111].

The parties have spent considerable effort trying to convince the Undersigned that Ms. Laudisio was or was not a Taverna director, and, if she was, when she became a director and whether she had the authority to vote as a director and retain Mr. Harris as Taverna's counsel. The parties have submitted a massive amount of exhibits and memoranda in furtherance of this litigation goal.

But the Undersigned concludes that there are two reasons why I need not grapple with this thorny issue: (1) an appellate court has already concluded, after ample briefing, in a comprehensive opinion, that Ms. Laudisio was **not** a director (and Plaintiff never filed a motion for reconsideration or for clarification about that conclusion with the Florida Third District Court of Appeal), and (2) *other* defense arguments are adequate to justify sanctions and attorney's fees: the simple fact that Plaintiff did not own the trademark and did not continuously use the trademark, which are critical components of this lawsuit.

Attorney Harris signed the lawsuit and motions containing these false allegations, and Ms. Fonseca signed an affidavit incorrectly representing (on December 18, 2015) that Plaintiff used the trademark at issue "continuously" since as early as

December 21, 2004. [ECF Nos. 1; 17].

Under these circumstances, it is appropriate to enter an award imposing sanctions and awarding attorney's fees against Harris, his law firm, and Ms. Fonseca. Therefore, the Undersigned **grants** Defendants' two motions and imposes sanctions and attorney's fees against Mr. Harris, his law firm, and Ms. Fonseca. The sanctions against Mr. Harris and his law firm are based on both 28 U.S.C. § 1927 and the Court's inherent authority, while the sanctions against Ms. Fonseca are based only on the Court's inherent authority.

Rather than pinpoint a specific amount of fees and costs now, the Undersigned believes it more prudent to await a final submission, as Defendants have asked for recovery of the fees and costs they incurred litigating the two motions. The sanctions litigation has generated a substantial amount of fees and costs, and it makes sense for the calculation of the amount to be made once, rather than twice. In fact, a substantial amount of the fees and costs incurred in this case were incurred after Defendants filed their sanctions motion in January 2017. Moreover, for reasons outlined below, the Order awards only half of the fees incurred by Defendants for litigating the sanctions motion after Plaintiff voluntarily dismissed the lawsuit. At bottom, it makes sense to await Defendants' final, amended submission of requested fees and costs before calculating the amount actually awarded.

Given this background and the Undersigned's finding that sanctions are

appropriate, I also see no need to address Defendants' argument, raised in their reply, that Mr. Harris and his law firm should be sanctioned for an additional reason: submitting a brief in opposition to the sanctions motion "which contains ten pages bearing flagrant plagiarism." [ECF No. 104, p. 2]. It is unclear how Defendants are directly prejudiced by a brief that contains arguments and case citations that are allegedly plagiarized. So the Undersigned deems this argument an unnecessary distraction from the substantive grounds at issue in the sanctions motion and related briefing, and I will not address it.

## Background

On November 10, 2015, Plaintiff filed the instant lawsuit for trademark infringement (count I), trade dress infringement (count II), unfair competition (count III), false designation of origin (count IV), Florida common law trademark infringement (count V), Florida common law unfair competition (count VI), and deceptive and unfair trade practices pursuant to Florida Statute § 501.204 (count VII). [ECF No. 1]. The initial complaint alleged that "Plaintiff has used the 'Il Carnevale Di Venezia' mark in commerce **continuously** since as early as December 21, 2004. [ECF No. 1, p. 2 (emphasis added)]. It also alleged that "Plaintiff is the **sole owner** of common law trademark Il Carnevale Di Venezia." [ECF No. 1, p. 3 (emphasis added)].

On December 19, 2015, Plaintiff filed a purported "emergency" motion for a preliminary injunction, seeking to enjoin Defendants from the continuing infringement

of Plaintiff's alleged common law trademark, and filed Ms. Fonseca's affidavit with the motion. [ECF No. 17]. On December 21, 2015, United States District Judge Joan A. Lenard struck the motion due to Plaintiff's failure to file a certification of emergency in compliance with Local Rule 7.1(d). [ECF No. 19]. Plaintiff did not refile the identical motion for preliminary injunction with Ms. Fonseca's same affidavit until August 18, 2016, **eight months later**. [ECF Nos. 35; 35-2]. Mr. Harris signed and filed a memorandum representing that Plaintiff is the sole owner of the Il Carnevale Di Venezia common law trademark and that Plaintiff has used the mark continuously since December 2004. [ECF No. 35-1].

On November 8, 2016, the Undersigned held a seven-hour evidentiary hearing on Plaintiff's motion for preliminary injunction. [ECF No. 60]. At the hearing, Mr. Harris and his purported[1] client's principal, Maricela Fonseca, admitted that certain statements in the Complaint he filed and in her affidavit were untrue. Specifically, they alleged that Taverna had made continuous use of the Il Carnevale de Venezia brand since 2004 -- but admitted at the hearing that the use was only through 2008. [ECF No. 93, pp. 194-95]. In other words, they conceded that the purported continuous use ended

---

[1] Mr. Harris filed this lawsuit on behalf of Taverna, but another law firm contends that **it**, not Mr. Harris, represents Taverna. Moreover, Defendants have steadfastly contended that Taverna never properly retained Mr. Harris and that Taverna never authorized the filing of the lawsuit. Given this background, the Undersigned uses the term "purported" when mentioning that Taverna is Mr. Harris' client. The Court will not expressly use the term "purported" to describe the Mr. Harris/Taverna relationship each and every time that I mention Mr. Harris and Taverna, but the caveat is implicit in each reference.

seven years before the lawsuit was filed.

In addition, Ms. Fonseca's efforts to explain away the incorrect representation were hardly convincing. According to Ms. Fonseca's hearing testimony [ECF No. 93, pp. 194-95], the allegations in the November 10, 2015 complaint [ECF No. 1, p. 2], and the representation in her December 18, 2015 affidavit that Plaintiff had used the mark in commerce "continuously since as early as December 21, 2014" [ECF No. 17, p. 3], were not technically inaccurate because the sentence saying that the trademark had been used "continuously" did not "say until present." Although Ms. Fonseca initially conceded that these representations were "false" [ECF No. 93, p. 194], she later said that she did not read the allegations that way. Specifically, she said, "[w]ell, instead of writing this, you could have written until 2008, but it doesn't mean that it's until present. It doesn't say the words 'until present.'" [ECF No. 93, p. 197].

Mr. Harris did not seem particularly troubled by this either, as reflected by the following excerpt from the hearing transcript:

> **THE COURT:** So what about this point? You alleged in your complaint, and Ms. Fonseca alleged in her affidavit, that the company had been making continuous use of the name *Carnevale*. Continuous use.
>
> **MR. HARRIS:** That is not true. That's --
>
> **THE COURT:** I'm sorry?
>
> **MR. HARRIS:** That is not true. That's correct.
> But -- but it's **semantics.** The point was that they were using it continuously from 2004 and they left out the part about 2008. The

point being, though, that it was a continuous use.

[ECF No. 93, p. 246 (emphasis added)].

On January 4, 2017, Plaintiff filed a voluntary dismissal without prejudice of all claims asserted in the complaint against each defendant. [ECF No. 89]. The voluntary dismissal did not explain *why* Taverna decided to dismiss its lawsuit. But, as outlined below, it is clear that an opinion from the Third District Court of Appeal in the related state court litigation caused the dismissal.

In particular, in a later hearing in this case, Mr. Harris explained that the appellate order "did in fact affect the case here." [ECF No. 153, p. 101]. He explained that the appellate court said, "we further conclude that the trial court properly determined that Jule Laudisio was not a director of Taverna Imports, a finding necessary to the Trial Court's ultimate determination that Mario Taverna was not validly removed as president of Taverna Imports, an act which requires majority vote of its board of directors." [ECF No. 153, p. 101].[2]

Later the same day of the voluntary dismissal (i.e., January 4, 2017), the Court closed the case [ECF No. 90], noting that a voluntary dismissal is effective immediately upon filing. Defendants then filed their motion for sanctions. [ECF No. 94].

Defendants are seeking sanctions under 28 U.S.C. § 1927 and the Court's inherent authority. The parties extensively briefed the motion [ECF Nos. 101; 104], and

---

[2] The Third District Court of Appeal's 32-page opinion in *Fonseca v. Taverna Imports, Inc.* is in the record here at ECF No. 91-1.

Defendants filed, almost six months later, a related motion for attorney's fees, based on the same purported misconduct outlined in their sanctions motion. [ECF No. 111]. The parties submitted comprehensive briefing on this motion, as well. [ECF Nos. 112; 114].

Noting that an order granting the motion would likely be based on a finding of bad faith by both Plaintiff and counsel, the Undersigned required the parties to mediate both motions. [ECF No. 115]. The mediation did not yield an agreement. [ECF No. 125]. The Undersigned then held a hearing on both motions. [ECF No. 133]. At that hearing, attorney Jennifer Kerr, who was on the appellate brief for Taverna, represented Ms. Fonseca, and Mr. Harris represented himself and his law firm.

<u>The February 21, 2018 Hearing</u>

To understand some of the arguments discussed at the February 21, 2018 hearing, the Undersigned deems it helpful to first mention some of the facts from the underlying scenario.

In April 2007, Marisela Fonseca and her husband, Richard Fonseca, squeezed out Mario Taverna from Taverna Imports. Consequently, Mr. Taverna, as the true President of Taverna Imports, was forced to file a lawsuit on behalf of his company, which was styled *Taverna Imports, Inc. v. Maricela Fonseca, et. al.*, Case No. 07-09620 (the "State Court Lawsuit"). On April 1, 2010, Miami-Dade Circuit Judge Victoria Platzer entered a partial summary judgment declaring Mario Taverna to be the President of Taverna Imports (the "April 2010 Judgment") [ECF No. 22-1, p. 4] -- the first of what would be

many rulings vindicating Mr. Taverna.

After a jury trial in 2014, verdicts were entered and Miami-Dade Circuit Judge Sarah Zabel entered judgment in favor of Mario Taverna and his company, Taverna Imports, Inc., and awarded damages in the amount of $1,063,234.00 and $833,000.00 against defendants Marisela Fonseca, Richard Fonseca, and others.

Approximately five months after the final judgment was entered, Ms. Fonseca called a purported "shareholders' meeting" for February 2, 2015. Ms. Fonseca and Jule Laudisio (who was not a shareholder of Taverna Imports pursuant to the April 2010 Judgment recognizing the validity of the stock sale in January 2007) improperly elected Ms. Laudisio to the Company's board of directors, over Mario Taverna's (President of Taverna Imports) objections. Later that day, and only *after* Mario Taverna terminated and left the meeting, Ms. Fonseca and Ms. Laudisio purported to take action in lieu of a directors' meeting and declared Ms. Fonseca the new President of Taverna Imports with the "consent" of Ms. Laudisio.

Acting under the purported authority as newly "elected" President, which was only made possible due to the results of the sham vote taken at the purported shareholders' meeting moments earlier, Ms. Fonseca allegedly terminated Taverna Imports' counsel since 2007, Rosenthal Rosenthal Rasco Kaplan ("RRRK"), and supposedly (and improperly) hired Mr. Harris to file the instant lawsuit for trademark infringement.

Countering Ms. Fonseca's actions during and immediately following the purported shareholders' meeting, Mario Taverna and Taverna Imports filed an Emergency Motion to Enforce Summary Judgment and Quash the February 2, 2015 Meeting. [ECF No. 68-3]. On January 11, 2016, and after *four evidentiary hearings*, Miami-Dade Circuit Judge Eric Hendon declared the results of the February 2, 2015 purported shareholders' meeting, and "any consequences taken at that meeting," null and void (the "January 2016 Order") [ECF No. 22-1, p. 6].

> **THE COURT**: This Court finds that any results taken as a result of that meeting are void, in that the meeting was not properly conducted. They did not follow proper procedures . . . *and any consequences of actions taken at that meeting are voided by this Court.*
> . . . .
>
> I've made my ruling. I'm voiding any consequences of the meeting that took place. It's the same ruling that we had a final hearing on this matter after the Court heard all the testimony when it was made at that time.
> . . . .
>
> **MR. RASCO**: I would like the order to reflect that Mr. Taverna, as a result of the meeting being void, Mario Taverna continues to be the president, because I want to make sure that they don't continue with their ultra vires endeavors, which is what they are doing.
>
> **THE COURT**: To the extent there are any actions that are going to be done, they have to be consistent with this Court's voiding of the election.

[ECF No. 66-1, pp. 18, 21, 22].

According to Defendants, these developments meant that "as of January 2016 at the very latest, Marisela Fonseca and Mr. Harris knew that he was *not* authorized to: (1)

file the instant lawsuit for trademark infringement and unfair competition and (2) represent Taverna Imports. [ECF No. 94, p. 5]. In fact, Mr. Harris knew of Judge Hendon's ruling, *having attended the January 11, 2016 hearing in person*. [ECF No. 22-1, ¶ 4].

On January 4, 2017, the Third District Court of Appeal affirmed the state court rulings. The appellate court held that the "trial court properly concluded that there were no genuine issues of material fact and that, as a matter of law, Jule Laudisio had validly sold her shares of Taverna Imports back to Taverna Imports." [ECF No. 91-1, p. 19].

The appellate court further held as follows:

> We further conclude that the trial court properly determined that **Jule Laudisio was not a director of Taverna Imports**, a finding necessary to the trial court's ultimate determination that Mario Taverna was not validly removed as president of Taverna Imports, an act which requires a majority vote of its Board of Directors. The only directors of Taverna Imports present and voting at the shareholders' meeting on February 27, 2007 were Mario Taverna and Maricela Fonseca. The minutes of the February 27 meeting (prepared by Maricela Fonseca) do not list Jule Laudisio as a director, instead listing her only as a shareholder. **Jule Laudisio herself testified at her deposition that the only position she ever held for Taverna Imports was that of vice president. There was no genuine issue of material fact in this regard**. As Taverna Imports' bylaws mandate that officers may be elected and removed only by a majority vote of the Board of Directors, none of the corporate acts undertaken at that meeting can be deemed valid as none of the acts was supported, as required, by a majority vote of the Board. Therefore, we affirm the lower court's entry of partial summary judgment on the claim for declaratory relief in Case One.

[ECF No. 91-1, p. 20 (emphasis added)].

And with respect to the verdicts in favor of Mario Taverna and against Ms. Fonseca, the Court found "that there was competent substantial evidence to support the jury's determination that Maricela Fonseca's malicious and willful misconduct constitute a breach of her fiduciary duty, resulting in individual losses suffered by Mario Taverna, for which Maricela and Richard Fonseca were liable." [ECF No. 91-1, pp. 21-22].

Framed by this background, the Undersigned will discuss relevant portions of the February 21, 2018 hearing before me:

Ms. Kerr, on behalf of Ms. Fonseca, argued that "we are now here because this lawsuit was dismissed without prejudice because the Third DCA was 'incorrect[,]'" as the "trial court never found that Miss Laudisio was not a director." [ECF No. 153, p. 31]. Ms. Kerr contended that this point (about Ms. Laudisio's status as a director) "was not an issue" on appeal and that the appellate court "erred." [ECF No. 153, p. 31].

The initial brief filed by the Fonsecas argued that Ms. Laudisio *was* a director, but that appellate argument concerned her status in February *2007* (not her status at the February 2015 meeting that Judge **Hendon** invalidated in a January 11, 2016 Order). [ECF No. 136, pp. 5–64]. The answer brief filed by Mario Taverna (and Taverna Imports, the plaintiff in this case) argued that Ms. Laudisio was never a director (but that argument also did not address that same meeting). [ECF No. 136, pp. 66–127].

Moreover, Ms. Kerr argued at the hearing that defense counsel in this case

admitted in the state court action that Ms. Laudisio *was* a director, and Ms. Kerr also contended that Mario Taverna admitted in several transcripts that Ms. Laudisio was a director. [ECF No. 153, p. 32]. The Undersigned noted at the hearing that Ms. Kerr's argument appeared to be that I should ignore the language from the appellate court's lengthy opinion because Ms. Kerr and Mr. Harris deemed it to be incorrect dicta.

However, Mr. Harris later explained during the hearing that a motion for rehearing had been filed with the appellate court -- but he conceded, in response to a question from the Undersigned, that the rehearing motion did *not* address the purported mistake concerning Ms. Laudisio's status as a director or whether the trial court ever ruled on her director status. [ECF No. 153, p. 104]. Ms. Kerr, who was involved in that appeal, explained that the motion for rehearing never asserted the argument that the appellate court incorrectly said that the trial court did not err because the trial court never made a finding about Ms. Laudisio's status as a director. Ms. Kerr said that the position that the appellate court took when it said that Ms. Laudisio was not a director "wasn't important" [ECF No. 153, p. 104], but it turned out to be **the** reason why Plaintiff voluntarily dismissed the lawsuit.

The Third District Court of Appeal issued its opinion on January 4, 2017, Appellants filed a motion for rehearing[3] with that appellate court, and on February 23,

---

[3]     The motion for rehearing, filed by Ms. Fonseca and Richard Fonseca, was technically entitled a motion "for rehearing and rehearing en banc." [ECF No. 136, p. 303]. The motion was 11-pages long and asserted four separate arguments. None of

2017, the appellate court issued its order denying the rehearing motion. [ECF No. 136, pp. 223, 303, 315]. Meanwhile, Plaintiff filed its notice of voluntary dismissal in this case on January 4, 2017, the same day as the appellate opinion. [ECF No. 89].

> Mr. Harris agreed with the proposition that he and his clients were
>
> now stuck with the unfortunate reality that there is a DCA opinion that says certain things about the facts that [are] detrimental to [his] position here on the sanctions motion, but that order remains because the Third DCA denied the motion for rehearing or reconsideration, and that motion for rehearing or reconsideration didn't challenge that one sentence on page 18 [of the appellate opinion] anyway[.]

[ECF No. 153, p. 105].

Nevertheless, Ms. Kerr still stridently represented that (1) the appellate court had provided an incorrect recitation of the trial court's factual findings and consequently reached a wrong conclusion in its opinion; (2) the trial court had never determined whether Ms. Laudisio was a director; and (3) there was contrary evidence to show that Ms. Laudisio **had** been a director at the relevant time. Given this position, the Undersigned directed her to file submissions after the hearing to support her position.

She did file exhibits, and at least one of those exhibits suggests that her position might be arguably correct. For example, Ms. Laudisio's affidavit, filed in the state court lawsuit in January 2009, states that she was a director. [ECF No. 162-5]. In addition, Mr. Harris separately filed a post-hearing submission with exhibits that he argued were

---

them, however, involved the issue of whether Ms. Laudisio was a director or if the trial court made any findings about that issue.

helpful to the view that Ms. Laudisio was, or had been, a director. For example, Mario Taverna testified in a September 2014 state court trial that he once appointed Ms. Laudisio as a director in an emergency. [ECF No. 160-3, pp. 3-4]. Similarly, an appellate brief filed by defense counsel in a state court case described Ms. Laudisio as a former director. [ECF No. 160-5]. And an excerpt from a September 8, 2014 state court trial shows that Ms. Laudisio testified that she had been a director. [ECF No. 160-6].

On the other hand, Defendants here filed responses to Plaintiff's post-hearing submissions and submitted their *own* exhibits in an effort to demonstrate why the appellate court's statement that Ms. Laudisio was never a director was correct. [ECF No. 165]. For example, they note that one of Mr. Harris' exhibits (ECF No. 160-2) contains testimony where Ms. Laudisio, in response to a question about whether she was aware that she was a director, said, "**<u>Supposedly</u>**, yes." [ECF No. 165, p. 3 (emphasis supplied)]. They submitted an excerpt from a March 2008 deposition where Ms. Laudisio testified that she did not recall taking any official act as vice president of the corporation and did not hold any other position or title. [ECF No. 165-3, p. 3].

In a memorandum filed in this case on December 9, 2015, Mr. Harris represented that "undersigned counsel was retained by a majority of the current board of directors of Plaintiff on **February 2, 2015** during a Shareholders' Meeting of the Company." [ECF No. 13, p. 2]. His memorandum advised that Exhibit A, the minutes of the February 2, 2015 shareholders' meeting, would reflect his retention. [ECF No. 13, p.

7]. **They do not**.  Instead, they discuss that the meeting was held to "consider and ratify the hiring of all professionals retained by the Company since the last meeting of the shareholders" and "procedures to authorize the Board of Directors or appropriate officers of the Company to hire professionals to act for, or on behalf of, the Company." [ECF No. 13, p. 7]. There is no mention in the minutes of retaining an attorney (in general) or of retaining Mr. Harris (in particular, as the attorney to represent Taverna).

Moreover, Judge Hendon's January 2016 Order invalidated the February 2, 2015 Shareholders' Meeting and deemed void all results of the vote taken there. [ECF No. 165-1].

<u>Mr. Harris' Shifting Explanations</u>

Defendants' sanctions motion targets Mr. Harris' purported retention as Taverna's counsel and argues that he lacked authority to represent Taverna and to file the lawsuit and other related motions (such as a request for a preliminary injunction). Consequently, the hearing before me involved a comprehensive discussion of the circumstances under which Mr. Harris had supposedly been retained.

Mr. Harris explained that he was not at the February 2, 2015 meeting but that his understanding is that "there was some confusion" and "a lot of yelling," and he was told that there was a "second meeting" that same day he was hired. [ECF No. 153, p. 78]. But he noted that he does not have any firsthand confirmation of that point. [ECF No. 153, p. 78].

Mr. Harris contended that there were actually *two* meetings that day: a shareholders' meeting and a board of directors' meeting. The Court asked Mr. Harris if he was aware of any minutes from *any* meeting that day in which he was appointed as counsel for Taverna. He said that he did not know. [ECF No. 153, p. 81].

Mr. Harris then advised that Ms. Fonseca, who was also present at the hearing before the Undersigned, "clarified [the events from February 2, 2015] a bit" for him, and she explained that the board decided at the February 2nd meeting to hire "an" attorney but that the *July* 7, 2015 meeting was the one where **he** was actually selected to be counsel of record for this lawsuit. [ECF No. 153, pp. 83-84].

Mr. Harris said that he did not make a misrepresentation in his memorandum when he said that he was retained on February 2, 2015, because the company did in fact decide to hire "an" attorney on February 2, 2015. Pressed to support his explanation, Mr. Harris then said: "I said I was hired on the 2nd. Okay. An attorney was hired on the 2nd, which ultimately was me several months later[.]" [ECF No. 153, p. 87].

The Undersigned then noted that Mr. Harris' theory would mean that every attorney could say that he was hired by Taverna on February 2, 2015 because the company decided to hire an attorney on February 2, 2015 and anyone who was an attorney on that date could conceivably be covered by the sweeping decision to hire a lawyer.

Mr. Harris finally conceded that his written representation about being retained

on February 2, 2015 was incorrect, but he provided his view that it was not a *misrepresentation*. "I think on its face is [sic] incorrect. If you added in the other part, which on July 7th I was the one identified maybe it would have been clearer. I don't think it's a misrepresentation though." [ECF No. 153, p. 89]. He stated that his "authority stems from the origination of the February 2nd meeting" and that he was "not trying to mislead the Court or make any misrepresentations" or "lie[.]" [ECF No. 153, p. 89]. He then added that his filing "could have been supplemented with the second meeting to clarify the point. It's the combination of the two meetings that led to my hiring." [ECF No. 153, p. 90].

Mr. Harris represented to the Court that he was actually retained at a *July* 7, 2015 board meeting but said that he did not have a copy of the minutes with him at the sanctions hearing. [ECF No. 153, p. 82]. The hearing before me had initially been scheduled in a February 7, 2018 scheduling order, but Mr. Harris did not, two weeks later, have in Court the exhibit to confirm the date he was supposedly retained. [ECF No. 126]. Defendants raised the lack of authority and unauthorized retention in the sanctions motion filed more than a year earlier, on January 27, 2017. [ECF No. 94].

At the hearing, in response to the Undersigned's questions, Mr. Harris initially and repeatedly represented that minutes of a July 7, 2015 board meeting do in fact exist, and he advised that those minutes had **already** been filed in the Court file. [ECF No. 153, pp. 56-58]. That representation was false.

Although Mr. Harris represented to the Court at the hearing that Taverna hired him (specifically, as opposed to reaching a decision to retain "a" lawyer) on either July 2 or July 7, 2015, he later filed a document on February 23, 2018 (as required by Court Order), claiming that there was "**no July 7, 2015 meeting**" and contending that he was actually purportedly hired during an *August* 5, 2015 meeting. [ECF Nos. 135; 139, p. 1].

But the document Mr. Harris filed with the Court as part of this February 23, 2018 submission makes no mention of him. In fact, the board minutes from that August 5, 2015 meeting simply say that "a new attorney must be hired for pursuing Company intellectual property that was illegitimately transferred to a third party without Board approval (i.e., 'the labels')." [ECF No. 139-1, p. 3]. They also say that Ms. Fonseca would "make a loan to the Company for the purposes of hiring legal representation to pursue meritorious claims on behalf of the company." [ECF No. 139-1, p. 3].

## Applicable Legal Standards and Analysis

Defendants seek fees and costs under 28 U.S.C. § 1927 and the Court's inherent authority. They do not seek any relief under Federal Rule of Civil Procedure 11, however.

Section 1927's purpose is to deter frivolous litigation and abusive practices by attorneys and to ensure that those who create unnecessary costs bear them. *Roadway Express v. Piper*, 447 U.S. 752, 762 (1980). To impose sanctions under this statute: (1) the attorney must engage in unreasonable and vexatious conduct; (2) that conduct must

multiply the proceedings; and (3) the amount of the sanction must bear a "financial nexus to the excess proceedings." *Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th Cir. 1997).

The standard for imposing sanctions under § 1927 turns on the attorney's objective conduct as compared to how a reasonable attorney would have acted under the circumstances. *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1282 (11th Cir. 2010). Objectively reckless conduct is sufficient to justify sanctions under § 1927 even if the attorney does not act knowingly and malevolently. *Id.* at 1291.

In *Amlong & Amlong, P.A. v. Denny's Inc.*, 500 F.3d 1230 (11th Cir. 2007), the Eleventh Circuit "observed that a district court's authority to issue sanctions for attorney misconduct under § 1927 is either broader than or equally as broad as the district court's authority to issue a sanctions order under its inherent powers." *Id.* at 1239 (citing *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1178 n.6 (11th Cir. 2005)). The Eleventh Circuit further explained:

> [i]f the sanctions were permissible under § 1927, then they were proper, and there is no need to examine whether the sanctions were also permissible under the court's inherent powers. On the other hand, if the sanctions amounted to an abuse of the district court's discretion under § 1927, they necessarily amounted to an abuse of the court's discretion under its inherent powers, because the court's inherent power to issue sanctions for vexatious conduct by attorneys does not reach further than § 1927.

*Id.*

Because § 1927 mentions "attorneys" and because Defendants seek a fee award

against both individual attorneys and their law *firm*, the Court needs to determine whether § 1927 authorizes sanctions against law **firms.**

In a recent order, *Collar v. Abalux, Inc.*, No. 16-20872, 2018 WL 3328682, at *12 (S.D. Fla. July 5, 2018), the Undersigned concluded that § 1927 could not be used to support an award against a firm or should not be used for that purpose under the particular factual scenario at issue there. In doing so, the Undersigned referred to *Avirgan v. Hull*, 932 F.2d 1572, 1582 (11th Cir. 1991), noted that it did not directly discuss the issue of whether § 1927 applies to law firms, and pointed out that it appeared as though none of the appellants even raised the issue in the first place. *Id.*

Nevertheless, in a later, albeit unpublished opinion, the Eleventh Circuit held that § 1927 "allows for sanctions against a law firm" and cited *Avirgan,* 932 F.2d at 1582 and *Malautea v. Suziki Motor Co., Ltd.*, 987 F.2d 1536, 1544 (11th Cir. 1993) as support. *Smith v. Grand Bank & Trust of Fla.*, 193 F. App'x. 833, 838 (11th Cir. 2006). In *Grand Bank & Trust*, the Eleventh Circuit gave a succinct explanation for its conclusion that § 1927 authorizes sanctions against a law firm (even though the statute does not mention law firms):

> *Avirgan* addresses sanctions under both Rule 11 and § 1927; however, the language of the decision tracks language applicable to § 1927-unreasonable and vexatious conduct. Thus, the court in *Avirgan* considered the standard under § 1927. Additionally, *Malautea,* which addresses sanctions under § 1927, cites *Avirgan,* and, therefore, this court has **implicitly** determined that § 1927 applies to law firms. We are not

bound by other circuits[4] that have reached the opposite conclusion.

*Grand Bank & Trust of Fla.*, 193 F. App'x. at 838 (emphasis added).[5]

Although *Grand Bank & Trust* is technically not binding because it is an

unpublished decision, other district courts have treated it as though it established a rule

---

[4]    As the Undersigned explained in *Abalux*, other federal appellate courts have concluded that the statute does **not** apply to law firms. *Abalux*, 2018 WL 3328682, at *12 (citing *BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 602 F.3d 742, 750–752 (6th Cir. 2010); *Claiborne v. Wisdom*, 414 F.3d 715, 722–724 (7th Cir. 2005)).

> At bottom, these appellate courts focused on the specific use of the term "attorney" in the statute and the fact that law firms are not "admitted" to "conduct cases" in federal courts. They also analogized to the rationale in *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120 (1989), where the Supreme Court considered the question of whether sanctions were proper against a law firm under an earlier version of Rule 11. In *Pavelic*, the Supreme Court construed language permitting sanctions only against the "person who signed" the offending document and determined that the language could only refer to the individual signer, not to his partnership. *Id.* at 127.

*Abalux*, 2018 WL 3328682, at *12.

But given our Circuit's ruling in *Grand Bank & Trust*, it is clear that our appellate court has now directly tackled the issue, decided to not follow these other circuits, and concluded that law firms are within § 1927's coverage.

[5]    Although the sanctions award at issue on appeal in *Malautea* involved a sanction against four individual attorneys directed to "satisfy personally" the fees and costs, and not against their law firm, the Eleventh Circuit simply quoted *Avirgan*, 932 F.2d at 1582, for the proposition that § 1927 allows district courts to "assess attorney's fees against litigants, counsel, and law firm who willfully abuse the judicial process by conduct tantamount to bad faith." 987 F.2d at 1544. The lack of discussion in *Malautea* may explain why the later appellate panel in *Grand Bank & Trust* described its prior decisions there and in *Avirgan* to reflect an "implicit" determination that the statute authorizes fees against law firms, and not only lawyers.

of law. *See, e.g., Larkin v. Fort Gatlin Shopping Ctr., LLC*, No. 6:15-cv-1295, 2016 WL 7474799, at *2 n.6 (MD. Fla. Dec. 8, 2016) ("In the Eleventh Circuit, law firms are also subject to sanctions under § 1927"); *Mobile Shelter Sys., USA, Inc. v. Grate Pallet Sols., LLC*, No. 3:10-cv-978, 2011 WL 7030963, at *6 (M.D. Fla. Nov. 10, 2011) ("sanctions under the statute may be levied against law firms, but not where only one attorney from the firm, who was fired during the litigation, worked on the case").

In addition to using § 1927 as authority to impose sanctions against an attorney and the law firm, a court may also, under its *inherent powers,* sanction both an attorney and the attorney's law firm for bad faith litigation conduct. *Spolter v. Suntrust Bank*, 403 F. App'x. 387, 391 (11th Cir. 2010) (affirming award of fees against individual lawyer and his law firm pursuant to the court's inherent powers); *In re Mroz,* 65 F.3d 1567, 1576 (11th Cir. 1995) ("there is nothing preventing a federal court from exercising its inherent power to sanction an attorney, a party, or a law firm for their subjective bad faith") (internal citation omitted); *Maale v. Kirchgessner,* No. 08–80131–CIV, 2011 WL 1458147, at *4 (S.D. Fla. Apr. 15, 2011) (awarding sanctions against attorney and his former law firm, jointly and severally, based upon the Court's inherent power); *Herard v. ATN Rest., Inc.,* No. 07–60269–CIV, 2008 WL 123596, at *5 (S.D. Fla. Jan. 8, 2008) (awarding fees against plaintiff's law firm in FLSA case under inherent power doctrine).

Courts have inherent power to levy sanctions against litigants for abuse of the judicial system even if procedural rules also exist that sanction the same conduct.

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991); *In re Mroz*, 65 F.3d at 1573-75; *Malautea*, 987 F.2d at 1546. One aspect of a court's inherent power is the ability to assess attorney's fees and costs against the client or his attorney, or both, when either has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 45-46. (internal quotations omitted).

But "[t]he key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (citing *In re Mroz*, 65 F.3d at 1575).

Magistrate Judge Jurisdiction: An Order or a Report and Recommendations?

Judge Lenard referred the sanctions motion to me but did not specify whether it was for an Order or a Report and Recommendations. [ECF No. 95]. The later-filed fees motion is based on the alleged misconduct outlined in the sanctions motion, so it is encompassed within the original referral. [ECF No. 111].

Magistrate judges have jurisdiction to enter sanctions orders when the result does not strike claims, completely preclude defenses, or generate litigation-ending consequences. To determine whether a sanction is dispositive or non-dispositive, the critical factor is what sanction the magistrate judge actually imposes, rather than the one requested by the party seeking sanctions. *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519-20 (10th Cir. 1995) (rejecting argument that magistrate judge ruled on dispositive motion because litigant sought entry of a default judgment and explaining that "[e]ven though a movant requests a sanction that would be dispositive, if the

magistrate judge does not impose a dispositive sanction," then the order is treated as not dispositive under Rule 72(a)); Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d § 3068.2, at 342-44 (West 1997).

A magistrate judge is authorized to enter a sanctions order, rather than a report and recommendations, when confronted with a sanctions motion seeking only attorney's fees and costs after the district court judge already entered judgment or dismissed the case. *See, e.g., Maisonville v. F2 Am., Inc.*, 902 F.2d 746, 747 (9th Cir. 1990) (finding that Rule 11 sanctions are non-dispositive matters "properly ordered by the magistrate and reviewed by the district court for clear error"); *Avendano v. Sec. Consultants Grp.*, 302 F.R.D. 588 (D. Nev. 2014) (ruling on non-dispositive Rule 11 and § 1927 sanctions motions); *Toth v. Alice Pearl, Inc.*, 158 F.R.D. 47 (D.N.J. 1994) (finding Rule 11 sanctions); *Scotch Game Call Co., Inc. v. Lucky Strike Bait Works, Ltd.*, 148 F.R.D. 65 (W.D.N.Y. 1993) (implementing sanctions under § 1927); *San Shiah Enter. Co., Ltd. v. Pride Shipping Corp.*, 783 F. Supp. 1334 (S.D. Ala. 1992) (imposing Rule 11 sanctions).

<u>Are Sanctions Appropriate?</u>

<u>Lack of Corporate Authority to File This Lawsuit</u>

Defendants have presented strong arguments to support their view that Taverna never properly retained Mr. Harris to file this lawsuit. Mr. Harris initially advised that the corporation retained him on February 2, 2015, but a Dade Circuit judge later deemed void all decisions made at the February 2, 2015 meeting. In addition, the

appellate court noted that Ms. Laudisio was never a director -- a finding which completely undermines the argument that Ms. Laudisio was one of the principals who retained Mr. Harris and authorized the filing of this lawsuit. Ms. Fonseca and Mr. Harris never challenged that appellate finding, and their view that the point was "unimportant" conflicts with the inescapable reality that the finding is the very circumstance that compelled them to file the voluntary dismissal that same day.

Beyond that, the explanations about the circumstances surrounding Mr. Harris' alleged retention are wobbly, changing, and problematic. First, Mr. Harris claimed that there had been a separate meeting on February 2, 2015. Then he said that the company retained him in July 2015. He then said that the company retained him in August 2015, but the exhibit he submitted to support this contention did not provide the necessary support.

The Undersigned is troubled by Mr. Harris and Ms. Fonseca's positions, and I certainly find Defendants' theory of recovery of sanctions to have substantial merit. Nevertheless, despite the legitimate challenges to the credibility of Ms. Fonseca and Mr. Harris, there is some evidence to suggest that Ms. Laudisio may have been a director at some point and to establish that the appellate court's statement could be incorrect or at least not adequately reflected in the state court record.

In their response to the sanctions motion, Plaintiff and Mr. Harris note that no court before the Third District Court of Appeal's decision had ever ruled that Ms.

Laudisio was not a director. [ECF No. 101, p. 17]. They also highlight that the point was not "directly at issue during the appeal." [ECF No. 101, p. 17]. Likewise, the response further points out that Ms. Laudisio, Ms. Fonseca, and Mr. Harris "all disagree with the ruling by the Third District Court of Appeals [sic]." [ECF No. 101, p. 17].

Because there are other grounds to support the sanctions award, the Undersigned will base the award on these alternate reasons. My decision to do so, however, in no way indicates that Defendants' position is without merit. Therefore, a reviewing court (either Judge Lenard or the Eleventh Circuit Court of Appeal) could affirm this fee-shifting award on the basis that Taverna lacked authority to file this lawsuit in the first place. *Cf. Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1303 (11th Cir. 2007) (reviewing court can affirm summary judgment on any legal ground, regardless of the grounds addressed and relied upon by the lower court); *Nat'l R.R. Passenger Corp. v. Rountree Transp. & Rigging Co.*, 286 F.3d 1233, 1263 (11th Cir. 2002) (noting that appellate court may affirm ruling below "as long as the judgment entered is correct on any legal ground regardless of the grounds addressed, adopted or rejected by the district court") (internal quotation omitted).

<u>Ms. Fonseca and Mr. Harris Knew Taverna Never Owned or Continuously Owned the Trademark at Issue</u>

To succeed on its claim, Plaintiff must make a predicate showing that it owns the rights to the Il Carnevale de Venezia mark. Here, the undisputed evidence overwhelmingly establishes that the Plaintiff has never been the owner of the

trademark or trade dress at issue. The evidence submitted at the November 8, 2016 evidentiary hearing showed that the Plaintiff formerly used the intellectual property under a Usage Agreement with a non-party; the non-party terminated the Usage Agreement; the intellectual property at issue was sold and assigned by the non-party to Mr. Franchi of A & M Wine and Spirits in 2008; and A & M Wine and Spirits has since owned, used, and registered the mark. Indeed, A & M Wine and Spirits enjoys rights and a presumption of ownership to the mark based on U.S. Registration No. 4,022,143.

A & M Wine and Spirits' registration is "prima facie evidence of the validity of the registered mark and of the registration of the mark, and of the ownership of the mark[.]" 15 U.S.C. § 1057(b). Thus, Plaintiff must (1) rebut the presumption that A & M Wine and Spirits owns the mark at issue and (2) establish the sweep and scope of ownership rights through evidence of "actual prior use in commerce." *Tally-Ho, Inc. v. Coast Cmty Coll. Dist.*, 889 F.2d 1018, 1022 (11th Cir. 1989) (internal citations omitted). "For a party to establish that it has superior rights to a mark based on the party's prior use of the mark, the party must present evidence demonstrating adoption of the mark and, second, evidence of use of the mark in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Maritec Indus. v. Sterling Powerboats, Inc.*, 75 U.S.P.Q. 2d 1145, 1148 (M.D. Fla. 2004).

In this case, Plaintiff failed to come forward with even a shred of evidence to

rebut the presumption of ownership of the mark or that Plaintiff was engaged in "actual prior use in commerce" that would somehow give it ownership rights to the mark. The sole countervailing evidence offered by Plaintiff, namely paragraph 10 of the complaint and Ms. Fonseca's sworn statement that Plaintiff has **continuously** utilized the mark in commerce since 2004, are, at best, gross misrepresentations and **admittedly false**, as noted during both the evidentiary hearing and the 2018 oral argument hearing.

Furthermore, and assuming *arguendo* that Plaintiff somehow had any rights in the trademark, such rights have been abandoned pursuant to 15 U.S.C. § 1127, due to nonuse. *See Tally-Ho, Inc.*, 889 F.2d at 1022-23 n.6 ("actual and continuous use is required" to obtain trademark ownership under the common law and "rights in a mark can be lost through abandonment, non-use, or a naked license without control over product quality"); s*ee also Celebrity Cards Int'l, Inc. v. Johnson,* No. 1:13-cv-22197, 2013 WL 12064554, at *4 (S.D. Fla. Oct. 9, 2013) (explaining that the "continuous use" requirement for "retaining a protectable interest" for a common-law trademark infringement claim and continuous use is "defined in contradistinction to abandonment, non-use or a naked license without control over product quality") (internal quotation omitted).

The Undersigned finds that false claims about ownership and continuous use were substantively significant and demonstrate that Plaintiff's arguments were without merit and frivolous -- and were vexatious and unnecessarily multiplied the

proceedings. *See Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1320 (11th Cir. 2002) (finding bad faith "where an attorney knowingly or recklessly raises a frivolous argument . . . for the purpose of harassing an opponent").

Moreover, Defendants highlighted the fact that Plaintiff's allegations were entirely untrue, and without factual and legal support, and also pointed to the false statement in Ms. Fonseca's affidavit regarding "continued use." [ECF No. 42, pp. 4-5].[6] A false statement in an affidavit is extremely troubling and, in the circumstances here, likely constitutes perjury.

The explanations for this misrepresentation that Mr. Harris and Ms. Fonseca proffered were patently inadequate. Contrary to Mr. Harris' so-called rationale, the falsity of the continuous-use representation is not a mere matter of "semantics." And Ms. Fonseca's proffered explanation is equally as unconvincing. If a party files a lawsuit and alleges that the mark is in continuous use, then the position being proffered is that the mark is also *currently* in use. The complaint, the initial emergency motion for injunctive relief, and the later-filed motion for a preliminary injunction were all based on the false representation that Taverna continuously owned the mark.

The Court understands that Taverna later, when confronted with the falsity of its

---

[6]     In this memorandum, filed on September 13, 2016, Defendants noted that Ms. Fonseca's affidavit that Taverna Imports "continuously used" the mark after a certain point in time "is directly at odds with the testimony taken during the Circuit Court proceeding establishing that Taverna Imports had ceased operations between 2007 and 2008."

representation, offered a purported *explanation* as to why the mark had **not been in use since 2008.** But that explanation,[7] even if true and even if indicative of fault by others, is not a justification for an incorrect, flat-out representation in 2015 and 2016 that Taverna owned and continually used the mark.

Similarly, Mr. Harris, his firm, Plaintiff, and Ms. Fonseca refused to withdraw the complaint (until the appellate court ruled against them) and refused to withdraw Ms. Fonseca's false affidavit. In fact, that false affidavit is *still* part of the record, as Plaintiff has never rescinded it or given official record notice that it is false. This behavior demonstrates vexatious litigation and it caused the proceedings to be unreasonably multiplied. *See Conner v. BCC Fin. Mgmt. Servs., Inc.*, 597 F. Supp. 2d 1299 (S.D. Fla. 2008) (finding that the defendant was entitled to fees pursuant to § 1927 after the plaintiff's counsel was advised that the plaintiff did not have a valid claim, yet the plaintiff's counsel continued to litigate the case, clearly multiplying the proceedings and justifying

---

[7] In a December 16, 2016 proposed Report and Recommendations on its motion for preliminary injunction, Taverna again alleged that it used the mark "in commerce continuously since as early as December 21, 2004." [ECF No. 84, p. 2]. It had a footnote next to the word "continuously," however. The text of the footnote is as follows:

> Plaintiff sold its wines continuously until Mario Taverna refused to submit paperwork for the necessary bond in the state of Florida to continue selling the wine in 2008. Mario Taverna has since not provided the necessary documents or submitted the information to obtain the bond. Thereafter litigation was initiated by Mario Taverna and all assets of il Carnevale di Venezia were transferred to A & M Wine and Spirits by Mario Taverna.

[ECF No. 84, p. 2 n. 1].

a finding of bad faith); *see also Scelta v. Delicatessen Support Servs.*, 146 F. Supp. 2d 1255, 1271 (M.D. Fla. 2001) ("The court of appeals has also said in this connection that when it becomes apparent that discoverable evidence will not bear out the claim, the litigant and his attorney have a duty to discontinue their quest.") (internal quotation omitted).

<u>Other Sanctions Orders against Mr. Harris</u>

In determining whether a legal claim or factual contention is objectively frivolous for purposes of assessing a sanctions motion, the court may consider whether the litigant or his counsel has a history of bringing unmeritorious litigation. *Bilal v. Driver*, 251 F.3d 1346, 1350 (11th Cir. 2001), *cert. denied*, 534 U.S. 1044 (2001) (noting that district court "was all too familiar with Plaintiff's repetitive and trifling litigation tactics"); *Petrano v. Nationwide Mut. Fire Ins. Co.*, No. 1:12-cv-86, 2013 WL 1325201, at *6 (N.D. Fla. Feb. 4, 2013) (same). In fact, the Advisory Committee Notes to the 1993 Amendment to Rule 11 explain that "whether the person has engaged in similar conduct in other litigation" may be properly considered. Fed. R. Civ. P. 11, Committee Notes to 1993 Amendment.

In their sanctions motion, Defendants note that a federal court has previously sanctioned Mr. Harris. [ECF No. 94, p. 16 nn. 11-12]. Specifically, Defendants refer to *In Re Damerau*, 525 B.R. 799, 806-808 (Bankr. S.D. Fla. 2015), where the court explained that "the Debtor suborned Mr. Harris to act as his catspaw" in a "scheme" that was "complex," and concluded that "Mr. Harris had been a chump to act as he did, and

sanctioned him $1,000 payable to the Trustee for the benefit of the estate," and noted that the sanction was imposed "to compensate the estate in part for the expense to which it had been put as a result of Mr. Harris' unauthorized actions."

Neither Mr. Harris nor Plaintiff responded to the allegations about the bankruptcy court's sanctions against Mr. Harris or the language it used to describe his conduct.

Despite the bankruptcy judge's negative comments about Mr. Harris, the Undersigned is not convinced that they unequivocally and directly relate to the type of bad faith conduct necessary to justify an attorney's fees sanctions award under the court's inherent authority or § 1927.

The bankruptcy judge's order explained that the Debtor provided false information to Mr. Harris about being retained by Gaddis Capital Corp. and that Mr. Harris acted upon the false information to file pleadings in state court without ever speaking to a Gaddis representative about the supposed (but actually non-existent) retention. After Gaddis learned of Mr. Harris' purported representation, Gaddis hired its own counsel, disavowed that Mr. Harris had been authorized to represent it in any matter, and apologized to the court.

The bankruptcy court's comment about Mr. Harris being a "chump" relates more to a finding of careless conduct than to bad faith. The bankruptcy judge also noted that, to the best of its knowledge, "it has never before or since met Mr. Harris, and the court's

expressed opinion regarding his chumpness was based solely upon the evidence adduced" at a hearing. *In re Damerau*, 525 B.R. at 808.

Although Defendants underscore the bankruptcy case as evidence of Mr. Harris' purported penchant to act in bad faith, the Undersigned views the judge's comments there differently. To be sure, those comments are hardly complimentary; to the contrary, they are negative and paint Mr. Harris in a bad light. Still, at bottom, they describe Mr. Harris as a "chump," not a liar or a bad-faith litigator.

According to the Merriam-Webster Dictionary, a "chump" is defined as a "fool" or a "dupe." And in the "English Language Learners" section, that same dictionary defines "chump" to be "a person who is easy to trick; a stupid or foolish person."[8]

For purposes of evaluating an attorney's culpability under § 1927, "reckless conduct" is sufficient to justify sanctions because, under "an objective analysis," reckless conduct "simply means conduct that grossly deviates from reasonable conduct." *Amlong*, 500 F.3d at 1240; *see Young Apartments, Inc. v. Town of Jupiter, Fla.*, 503 F. App'x. 711, 725 (11th Cir. 2013) (citing *Amlong* for the rule that the bad faith standard under § 1927 "is an objective standard that is satisfied when an attorney knowingly or recklessly pursues a frivolous claim or engages in litigation tactics that needlessly obstruct the litigation of non-frivolous claims"); *see also Oliva v. NBTY, Inc.*, 583 F. App'x. 877, 881 (11th Cir. 2014) (noting that "negligent conduct alone is insufficient" for

---

[8] *See* https://www.merriam-webster.com/dictionary/chump (last visited July 23, 2018).

§ 1927 sanctions and explaining, through a citation to *Amlong*, 500 F.3d at 1240-42, that "reckless conduct is that which grossly deviates from reasonable conduct").

So Mr. Harris may have been a chump in that bankruptcy case, but the Undersigned does not know enough about the background there to conclude that he acted *recklessly*, rather than simply negligently.

But Didn't Plaintiff "Do the Right Thing" By Voluntarily Dismissing The Lawsuit?

Mr. Harris, his firm, and Ms. Fonseca note that they voluntarily dismissed the lawsuit after the appellate ruling, a step they deem to be one where they did the right thing -- and one, therefore, undermining a sanctions-award request.

They highlight their position of disagreeing with the appellate court's holding about Ms. Laudisio not being a director. They also contend that they "had a good faith basis to file the lawsuit and a colorful position to maintain it had standing to do so" and argue that "Defendants cannot show any previous record that Plaintiff or its counsel knew with any certainty or had prior knowledge that the lawsuit was filed in bad faith and/or with prior knowledge that no authority existed to file the lawsuit." [ECF No. 101, pp. 17-18].

In response, Defendants basically repeat their position that Ms. Laudisio was not a director, that a Dade Circuit Court judge voided the actions taken at the February 2, 2015 meeting, and that the appellate court agreed.

This back-and-forth discussion concerns the issue of whether Ms. Laudisio was

ever a director and, if so, then whether Taverna ever properly retained Mr. Harris to file this lawsuit. But the Court's sanctions award is not based on this issue, so the argument that Plaintiff acted responsibly by voluntarily dismissing the lawsuit after the appellate decision was issued does not in any way address the issue of whether Plaintiff owned and continuously used the mark (and whether Plaintiff, its counsel and, Ms. Fonseca falsely claimed that Taverna did).

Plaintiff pursued its claim by advocating a factually incorrect position -- that it owned the mark and made continuous use of it. By doing so, Plaintiff (and its attorneys and principal) was engaged in vexatious conduct that multiplied the proceedings.

Defendants never served or filed a sanctions motion under Federal Rule of Civil Procedure 11, so this case does not involve the so-called safe harbor provision applicable to a Rule-based sanction. Section 1927 does not include a safe harbor period, and the Court may also issue a sanctions award under its inherent authority without providing a safe harbor escape valve.[9]

On the other hand, there is no denying that Defendants did in fact voluntarily dismiss the lawsuit once the state appellate court issued an opinion in which it

---

[9]     The Advisory Committee Notes to the 1993 Amendment to Rule 11 explain that the provisions requiring the movant to wait at least 21 days after serving the motion before actually filing it are "intended to provide a type of 'safe harbor' against motions under Rule 11 in that a party will not be subject to sanctions on the basis of another party's motion unless, after receiving the motion, it refuses to withdraw that position or to acknowledge candidly that it does not currently have evidence to support a specified allegation." Fed. R. Civ. P. 11, Committee Notes to 1993 Amendment.

concluded that Ms. Laudisio was never a director. This finding destroyed Plaintiff's theory that Taverna was authorized to file the lawsuit because it retained Mr. Harris at a February board meeting in which Ms. Laudisio voted in favor of retaining Mr. Harris. There are (and were) other problems with Taverna's theory, such as the fact that the minutes from that meeting do not say that the corporation retained Mr. Harris. Nevertheless, the Undersigned is reluctant to completely adopt a sweeping no-benefit-for-finally-doing-the-right-thing approach.

The Undersigned understands, of course, that Plaintiff and its counsel (and Ms. Fonseca) would likely have been responsible for even *more* fees and costs had they decided to still pursue this lawsuit after the state appellate court's decision (because they likely would have lost on a summary judgment motion, given the lack of ownership and continuous use).

The imposition of sanctions under § 1927 is an "extraordinary remedy," which should be used sparingly. *See Monk v. Roadway Exp., Inc.*, 599 F.2d 1378, 1382 (5th Cir. 1979) (classifying § 1927's provision for assessment of fees, expenses, and costs as an "extraordinary remedy"). And although the Court's inherent power "is both broader and narrower than other means of imposing sanctions," *Chambers*, 501 U.S. at 46, the court must exercise its inherent power with "restraint and discretion." *Id.* at 44. When considering sanctions under the court's inherent power, the threshold of bad faith conduct "is at least as high as the threshold of bad faith conduct for sanctions under §

1927." *Amlong*, 500 F.3d at 1252.

Because the Court has broad discretion to award sanctions, *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994) (holding that the word "may" in a statute "clearly connotes discretion") and because sanctions should be used sparingly, the Undersigned deems it prudent to adopt a conservative approach when calculating the amount of fees to award.

But Defendants Never "Prevailed," So May They Still Obtain Sanctions?

Plaintiff argues that "awarding attorney's fees under the Court's inherent power can only be done when there is a prevailing party." [ECF No. 101, p. 19]. Noting that the case was voluntarily dismissed before any substantive court ruling, Plaintiff and its counsel stress that Defendants did not prevail on any motion ever filed with the Court. They cite only one case for this argument: *Oliveri v. Thompson*, 803 F.2d 1265, 1271 (2d Cir. 1986) (noting that under their inherent power, courts may award a reasonable attorney's fee "to the prevailing party when the losing party has 'acted in bad faith, vexatiously, wantonly or for oppressive reasons'") (internal quotation omitted). Stressing that it did not "lose" and that Defendants did not therefore "prevail," Mr. Harris, his law firm, and Ms. Fonseca argue that the court's inherent power cannot be used to support a fees sanction.

But Defendants say that § 1927 contains only two requirements and that neither restricts a sanctions award in favor of only a prevailing party. [ECF No. 104]. They also

argue that a court's inherent authority does not contain a prevailing-party requirement either.

The purpose of § 1927 is "to deter frivolous litigation and abusive practices by attorneys and to ensure that those who create unnecessary costs bear them." *Footman v. Cheung*, 341 F. Supp. 2d 1218, 1223 (M.D. Fla. 2004). Consequently, it "'**does not distinguish between winners and losers**, or between plaintiffs and defendants . . . . It is concerned only with limiting the abuse of court processes.'" *Boler v. Space Gateway Support Co., LLC*, 290 F. Supp. 2d 1272, 1277 (M.D. Fla. 2003) (emphasis added) (quoting *Roadway Express Inc.*, 447 U.S. at 762).[10]

The Court is not convinced by the argument that a § 1927 award requires that the sanctioned party be a loser on a substantive issue or that the party seeking sanctions must have prevailed. If that were the rule, then an attorney who in bad faith filed a ridiculously meritless complaint that had a blatantly inadequate factual basis and lacked even a colorable legal theory could force a defendant to incur fees and costs (not to mention stress), litigate the case by asserting frivolous positions, and then voluntarily dismiss the lawsuit and escape all liability under § 1927.

Similarly, an attorney could file a legitimate complaint but then act outrageously on certain matters, increasing the costs of litigation but dodging § 1927 fees if the

---

[10]     In *Roadway Express*, the United States Supreme Court explained that § 1927 "is indifferent to the equities of a dispute and to the values advanced by the substantive law. It is concerned only with limiting the abuse of court processes." *Id.* at 762.

C=court did not enter a substantive ruling against Plaintiff. These scenarios, all permissible under the approach urged by Mr. Harris, his law firm, and Ms. Fonseca, are illogical, inequitable, and inconsistent with the policy reasons underlying the statute. *See Smith v. Grand Bank & Trust of Fla.*, No. 04-80343, 2005 WL 6106148, at *8 (S.D. Fla. Apr. 28, 2005) (issuing report recommending award of sanctions against the plaintiff's counsel under § 1927 even though the lawsuit being challenged was dismissed before the court ruled on the defendant's summary judgment motion, and noting that "attorneys are obligated to avoid dilatory tactics throughout the entire litigation").[11]

<u>May Sanctions Be Awarded For Filing A Frivolous Complaint?</u>

Mr. Harris and his law firm argue that they cannot be sanctioned under § 1927 for filing a complaint even if it were to be deemed frivolous. Specifically, they contend "that an attorney cannot be sanctioned under § 1927 for simply commencing a frivolous lawsuit as they have pled in their motion for sanctions or bringing a motion for preliminary injunction." [ECF No. 101, pp. 13-14]. They rely on *Jensen v. Phillips Screw*

---

[11]    The district court did not adopt the magistrate judge's "incredibly thorough report and recommendations" but denied the sanctions motion for reasons other than the fact that there was no prevailing party. *Smith v. Grand Bank & Trust of Florida*, 2005 WL 6108992, at *1 (S.D. Fla. June 13, 2005). Specifically, the district court held that the attorney's actions, which "failed to meet the ideal standards for competence," did not rise to the level of willful abuse of the judicial process by conduct tantamount to bad faith. *Id.* In an unpublished opinion, the appellate court affirmed, noting that "the fact that we may reach the opposite conclusion does not mean the court abused its discretion in determining that [the attorney]'s conduct did not amount to bad faith. *Grand Bank & Trust of Florida*, 193 F. App'x. at 837. The Eleventh Circuit's opinion, similar to the district court's opinion, did not even mention the fact that there was no "prevailing party." *Id.*

*Co.*, 546 F.3d 59, 65 (1st Cir. 2008), which notes that § 1927 covers acts which "multiply" the proceedings, points out that "commencing a proceeding is not the same as multiplying a proceeding" and concludes that, to be sanctionable, "conduct must have an effect on an already initiated proceeding." *Phillips Screw* pointed out that its statutory construction analysis led it to "join an unbroken band of cases across the courts of appeals holding that a lawyer cannot violate section 1927 in the course of commencing an action." *Id.* (citing cases).

But even if *Phillips Screw's* statutory construction argument applies to the Eleventh Circuit (and Mr. Harris, his firm, and Ms. Fonseca have not cited any in-circuit cases for this point), the First Circuit noted that its holding was limited to § 1927, and then emphasized that "shoddy work related to the commencement of an action **may be sanctionable under** *other* **approaches**." 546 F.3d at 65 (emphasis added).

Moreover, the Undersigned is not basing the sanctions award on a conclusion that the filing of the complaint itself was the bad faith misconduct which triggered sanctions and is the event from when the sanctions amount should be calculated.

Signed by Mr. Harris on behalf of his law firm, the complaint here was filed on November 10, 2015. [ECF No. 1]. A week later, on November 17, 2015, defense counsel sent Mr. Harris a letter "advising that sanctions would be sought if the instant lawsuit was not withdrawn." [ECF Nos. 22-1; 104, p. 5 n. 5]. Moreover, on January 15, 2016, Defendants filed a motion to dismiss and attached an affidavit from Mario Taverna.

[ECF Nos. 22; 22-1]. In that motion, Defendants noted that the facts alleged in the complaint were inaccurate and that the lawsuit was filed without Taverna Imports' knowledge, consent, or authority. Among other points raised in the motion and affidavit, Defendants' January 15, 2016 submission emphasized that Taverna Imports did not exercise any control over, or claim to possess any right, title or interest in the mark.

Defense counsel's November 17, 2015 letter underscored the point that defense counsel, not Mr. Harris, actually represented Mr. Taverna and Taverna Imports and warned Mr. Harris that his clients would hold Mr. Harris responsible for all fees and costs incurred if he did not "heed the demand and dismiss your unauthorized actions." [ECF No. 22-1, p. 2].

Defendants followed up several weeks later in a January 13, 2016 letter to Mr. Harris. [ECF No. 22-1, pp. 12-13]. In this letter, defense counsel noted that Judge Hendon had, two days earlier, issued an order declaring the so-called February 2, 2015 shareholders' meeting (where Ms. Laudisio was supposedly elected to the board of directors) to be null and void. The letter repeated the position that Mr. Harris lacked authority to file the lawsuit on Taverna's behalf. It also noted that "the allegations in your complaint are frivolous and lack any factual support." [ECF No. 22-1, p. 12]. It also expressly invoked § 1927 and "strongly urge[d]" Mr. Harris to "dismiss your Complaint with prejudice." [ECF No. 22-1, p. 13].

In response to a similar email sent on January 12, 2016, Mr. Harris sent a two-sentence email on January 13, 2016, saying that he was not retained at the February 2, 2015 shareholders' meeting and announcing that he, therefore, would not be dismissing the case. [ECF No. 22-1, p. 15].

After the Court struck Plaintiff's initial December 19, 2015 emergency motion for a preliminary injunction, Plaintiff, through Mr. Harris, waited an additional nine months before filing another motion for a preliminary injunction. [ECF Nos. 17; 19; 35]. In their September 7, 2016 response, Defendants argued that there was no evidence to believe that Taverna Imports continuously used the mark at issue. [ECF No. 37-1]. It also pointed out that Ms. Fonseca's assertion that Taverna Imports continuously used the mark "is directly at odds with testimony taken during a state court proceeding," which "establish[ed] that Taverna Imports had ceased operations between 2007 and 2008." [ECF No. 37-1, p. 4].

This September 7, 2016 submission was the first time that Defendants expressly put Mr. Harris on notice that the ownership and continuous-use allegation concerning the mark was false. It was also the first time Defendants provided specific evidentiary support for this point.

<u>May the Court Enter Sanctions against Ms. Fonseca, Who is Technically a Non-party?</u>

Ms. Fonseca's status as a non-party does not immunize her from a sanctions award. The court's inherent power to sanction includes sanctioning non-parties for bad

faith conduct. *See Chambers*, 501 U.S. at 41.

To be sure, additional safeguards are warranted when a non-party is being sanctioned. But if a non-party is shown to (1) have a substantial interest in the outcome of the litigation and (2) have substantially participated in the proceedings, then a court has authority to impose sanctions. *Sciarettta v. Lincoln Nat'l Life Ins. Co.*, 778 F.3d 1205 (11th Cir. 2015) (imposing $850,000 sanctions award against non-party and noting that the trial court found the company to be "the driving force behind the litigation"); *JTR Enters., LLC v. An Unknown Quantity*, 93 F. Supp. 3d 1331, 1336 (S.D. Fla. 2015) (rejecting argument that court lacks power to sanction non-party and holding that court's inherent power "to police itself and to vindicate judicial authority extends to non-parties"); *Lincoln Nat'l Life Ins. Co. v. Biviano*, No. 09-82447, 2011 WL 13108072, at *2 (S.D. Fla. April 1, 2011) (finding that power to sanction extends to non-parties for bad faith actions); *Pafumi v. Davidson*, No. 05-61679, 2008 WL 4084418, at *6 (S.D. Fla. Sept. 3, 2008) (noting that non-party's activities would be considered when determining sanctions); *Mastercard Int'l v. Ishak*, No. 01-4300, 2004 WL 1059795, at *4 (S.D. Fla. Mar, 11, 2004) (finding that the court "may sanction a corporate officer for his bad-faith conduct during litigation by imposing attorney's fees even when the corporate officer is a non-party").

In this case, Ms. Fonseca meets both of the limiting factors that courts use when evaluating whether to impose an attorney's fees sanction against a non-party. Ms.

Fonseca is intimately involved with Taverna Imports and has been closely involved with this lawsuit (and all other litigation between the parties). Not only did she sign the affidavit with the false claim of continuous ownership, but she testified at the November 8, 2016 evidentiary hearing on Plaintiff's motion for a preliminary injunction, and also attended the February 21, 2018 hearing. It would be difficult to imagine someone more involved in this litigation from Plaintiff's perspective than Ms. Fonseca.

Accordingly, the Court has inherent authority to issue attorney's fees against her for bad faith conduct in this litigation.

<u>Calculating the Award</u>

There are surely sound reasons to support the conclusion that a sanctions award of fees and costs against Mr. Harris, his law firm, and Ms. Fonseca should date back to the November 10, 2015 filing of the lawsuit that Mr. Harris ultimately dismissed. However, given the equitable factors counseling in favor of a limited and conservative approach, the Undersigned concludes that **September 7, 2016** is a more-appropriate date to use for the starting date of the sanctions calculation. As outlined above, that is the first time Defendants unequivocally placed Mr. Harris, his firm, and Ms. Fonseca on notice that the critical allegations in the complaint -- that Taverna Imports owned and continuously used the mark -- were meritless.

For purposes of submitting a follow-up, amended sanctions motion for

attorney's fees and costs, Defendants should use September 7, 2016 as the starting point. Moreover, the fees they seek should be reduced by half for all the time incurred after Plaintiff voluntarily dismissed the lawsuit on January 4, 2017. The costs, however, will not be reduced for expenses incurred after January 4, 2017.

Defendants shall **file** an amended sanctions motion for fees and costs, based on the formula described above, by **August 31, 2018**. They shall not include any discussion about entitlement. They may, if they wish, submit material to support the hourly billing rates and any arguments concerning the billing judgment of their attorneys.

Instead of providing Mr. Harris, his firm, and Ms. Fonseca with a draft motion 30 days before filing the amended request/motion, as would otherwise be required by Local Rule 7.3(b), Defendants shall serve their draft amended motion at least <u>14 days</u> before the August 31, 2018 deadline. Mr. Harris, his law firm, and Ms. Fonseca shall confer with defense counsel within 10 days of service of the amended draft motion.

Mr. Harris, his law firm, and Ms. Fonseca may not object to the hourly rates used or to the billing judgment used for entries before July 21, 2017, the date of their response to Defendants' motion for attorney's fees. They have waived their ability to mount those challenges because their initial response did not in any meaningful way challenge the fees requested. [ECF No. 112]. Saying only that the time entries for Malloy and Malloy "are illegible due to redactions and would be subject to further evidentiary hearings, if considered" is hardly the type of challenge that Local Rule 7.3 mandates.

[ECF No. 112, p. 16]. Similarly, arguing that fees for the RRRK firm are "excessive and not permissible" because Mario Taverna was in bankruptcy and because the law firm never filed a formal notice of appearance is also an insufficient challenge under Local Rule 7.3. [ECF No. 112, p. 16].

But Mr. Harris, his firm, and Ms. Fonseca may interpose objections to time entries and costs after July 21, 2017. They may not oppose the hourly billing rates. Any challenge to the amended motion for fees and costs must first be described in writing and with reasonable particularity. If no agreement is reached and Defendants file an amended motion for fees and costs, then Mr. Harris, his firm, and Ms. Fonseca shall file their opposition response within 14 days after the amended motion is filed and served. Pursuant to Local Rule 7.3(a), any written objection "shall describe with reasonable particularity each time entry or nontaxable expense to which [they] object" and shall also "provide supporting legal authority." S.D. Fla. L.R. 7.3(a).

**DONE and ORDERED** in Chambers, in Miami, Florida, on July 27, 2018.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Joan A. Lenard
All Counsel of Record